IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRELL T. SHARP,<br><br>               Petitioner,<br><br>vs.<br><br>D. K. SISTO, Warden, California State Prison, Solano,<br><br>               Respondent. | No. 2:07-cv-02756-JKS<br><br>MEMORANDUM DECISION |

Darrell T. Sharp, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus Relief Under 28 U.S.C. § 2254.  Sharp is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the California State Prison, Solano.  Respondent has answered, and Sharp has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

In January 1978, following a trial by jury, Sharp was convicted in the Alameda County Superior Court of Murder in the First Degree (Cal. Penal Code § 187).  The jury also found true that Sharp had used a firearm in committing the offense (Cal. Penal Code § 12022.5).  The trial court sentenced Sharp to life in prison with the possibility of parole.[1]  Sharp appealed his conviction and sentence to the California Court of Appeal, First District, which affirmed his

---

[1] Under California law, Sharp became eligible for parole after serving seven years.  Cal. Penal Code § 3046(a).

conviction and sentence.  The California Supreme Court summarily denied review.  Sharp does

not challenge his conviction and sentence in this proceeding.

In June 2006 Sharp made his eleventh parole-suitability appearance before the Board of

Prison Terms ("Board").  The Board determined that Sharp posed an unreasonable risk of danger

to society or a threat to public safety and found Sharp unsuitable for parole.  The Board denied

Sharp parole for a period of one year.  Sharp filed a petition for habeas relief in the Alameda

County Superior Court, which denied his petition in an unpublished, reasoned decision.  Sharp's

subsequent habeas petition to the California Court of Appeal, First Appellate District, was

summarily denied.  Sharp's habeas petition to the California Supreme Court was also summarily

denied on October 12, 2007.  Sharp timely filed his Petition for relief in the United States District

Court for the Northern District of California on December 10, 2007.  Sharp's Petition was

transferred to this Court.

As summarized by the Board, the facts underlying Sharp's conviction were:

On February 6th, 1977, Robert C. Bell left home to visit his grandfather.
Bell was last seen walking eastbound on the tracks at 54th Avenue with Darrell
Sharp and Junior Johnson.  Three days later, on February 9th, 1977, Bell was
found dead.  Subsequent autopsy determined that two .22 caliber bullets and bullet
fragments, along with hair taken from the vicinity of the wounds, suggested an
execution style killing.  The facts surrounding Bell's death began on January 28th,
1977, when Junior Johnson approached James Lewis, manager of Victoria Station
restaurant, robbed him of his restaurant receipts, shot Lewis's dog, and shot Mr.
Lewis through the heart.  Mr. Lewis survived.  Over four thousand in cash and
checks were taken.  Around the same time, Robert Bell, a friend of Junior - Junior
Johnson and Sharp, began to give Officer Conner, C-O-N-N-E-R, information
about the Victoria Station robbery.  This information was later turned over to
Sergeant Rothacher, R-O-T-H-A-C-H-E-R.  On February 3rd, 1977, Bell and
Sergeant Rothacher met.  Bell told Sergeant Rothacher that Sharp had been the
getaway driver of the Victoria Station robbery shooting, and that, quote, "Terry
Smith," close quote, had been the gunman.  Sergeant Rothacher determined that
Terry Smith was in fact Junior Johnson.  On February 5th, 1977, Sharp attempted
to rob Willie Brown's Liquors.  Later that afternoon, Robert Bell told Officer

Conner that Sharp was the person who had tried to rob Willie Brown's Liquors. On February 6th, 1977, Sharp and Johnson, in the presence of Melia Potes - and that's spelled P-O-T-E-S - who was Johnson's girlfriend, met and talked about Bell. Johnson and Sharp - Johnson told Sharp that Bell had talked too much to Officer Conner. Sharp agreed, and stated that he himself would kill Bell. Later that day, with Glenn Harrison, H-A-R-R-I-S-O-N, who was Bell's best friend, present, they told Harrison that they were going to kill Bell because he had talked to the cops. Sharp raised his coat, revealing the .22 caliber revolver. The victim, Bell, arrived at the house, and subsequently left on foot with Johnson and Sharp. Later they were seen walking eastbound on the tracks at 54th Avenue. On February 8th, 1977, Sharp admitted to his brother, Stanley Sharp, and Glenn Harrison, that he had in fact killed Robert Bell by shooting him, quote, "in the head two times." Sharp was arrested later that evening and taken into custody.[2]

## II.  GROUNDS RAISED/DEFENSES

In his Petition, Sharp advances several arguments. Distilled to their essence, those arguments present but a single issue cognizable in this Court in a federal habeas proceeding: the finding that Sharp posed an unreasonable risk of danger to society or a threat to public safety is unsupported by some evidence. Respondent does not assert any affirmative defense.[3]

## III.  DISCUSSION

In denying Sharp parole, the Board held:

> **PRESIDING COMMISSIONER FARMER**: Okay. Mr. Sharp, we have a decision in your case. We have reviewed all the matters presented at your hearing contained in your file, the questions that we asked an [*sic*] answered, the written documents submitted, the arguments of counsel and statements that you have made. We review all the information and rely upon the following circumstances to conclude that we believe that you remain unsuitable for parole and would continue to pose an unreasonable risk of danger to society or a threat to public safety if released. You know, this is a work in progress, and you've got a lot of negatives that you've got to deal with. You're making - you know, when I - when I deny you a date, I don't want to do so without telling you I think that you've come a long way and that you're close, closer. There still are some

---

[2] Docket No. 14-2, pp. 51-53.

[3] *See* Rules—Section 2254 Cases, Rule 5(b).

concerns that we have.  This analysis will always start with your commitment offense.  Inmates say, "I can't change that commitment offense."  The response to that is, I can't change it either.  You know, in this case you were convicted of first-degree murder, and it was a - a fairly egregious first-degree murder, you know, these descriptions that were put in here, that it was carried out in as [*sic*] especially cruel or callous manner, in a calculated manner, which was an execution-style murder, carried out in an exceptionally - a manner which demonstrates an exceptionally callous disregard for human suffering.  The motive for the crime was trivial in relation to the offense.  These conclusions come from the facts in which you have a person who was cooperating with the police and talking to them about the criminal activities of you and your crime partner, and you volunteered, and then did carry out a plan to shoot him.  Lured him from his home, took him to a remote location, and shot him.  I understand that - now you have told various versions of what occurred.  You've talked about - when I talk with people about the offense and - and the [*sic*] indicate, as you've done, that they accept full responsibility for their actions, my the first question is always, "Well, what are you taking responsibility for?"  Everything I've read about you, when you say that you take responsibility now for (indiscernible) and the crime that you committed, I find a lot of truth in that.  I - in talking with you, you do speak candidly, I don't think you're trying to evade responsibility, and so it's not like you are, as you did initially, denying that you were there.  I got to tell you, people have listened and the psychologists have listened to what you have said about the motivation for the crime, or what you were doing at the time and the period you have, it doesn't ring real true to me.  I haven't gone through your jury transcript and listened to what all the witnesses had to say, but when I look at the jury's verdict and when I read what I understand they had - what they had to say, I believe it happened just as was earlier described and you just don't want to talk about it.  Now that's your right, and I don't want to say that we're denying you solely based upon that what I think is kind of a lack of desire to talk about it.  You're not the first person that wants to say, "Yeah, I shot this guy because he was snitching us off, and that was my mindset at the time.  You've got a lot of other things that - that are favorable, the insight, the complete insight into what occurred, is - is though not totally negative, it's not totally positive (indiscernible) talk about, and, you know, it wouldn't hurt to do that, because you are - it's not like you're saying that I'm not there, you are saying, "Yeah, I do accept responsibility for his killing and I'm sorry that this happened," and I believe those things are true.  I don't think you fully want to come to - to grips with the totality of what you did.  Obviously your  history prior to this crime you were a work in progress, up to this conviction to get you here, working your way up from minor to serious, going starting as a juvenile at nine year-old, before the judge to be sent to the boys' camp, getting sent to CYA, but doing satisfactory on parole from CYA, and you - you took all the steps to get here, and then, you know, you started out in the institution with that mindset continued, as reflected most immediately

by your disciplinary history, your ten 115s, the last one in '97, and then we had - I
didn't get the 128 totals-

      **DEPUTY COMMISSIONER SMITH:**  There were six.

      **PRESIDING COMMISSIONER FARMER:**  There were six, this last
one this last year.  That's - that's not - this last one's not a - the most serious thing
that happened, but it - it also is not favorable.  You understand their need to - that
you been totally disciplinary free, so it was discussed, okay, how serious was that?
Well, obviously it's not as serious as a 115, it's just one of the minor negatives
that will exist.  Your vocational programming has been excellent.  We give great
credit for that.  You do a good job in your job, you work with the PIA, you're
taking classes.  You have developed marketable skills, and that's a real important
plus on your side, okay, and, you know, we want to acknowledge that, and - and
from the standpoint of your ability to succeed on the outside, having marketable
skills is pretty much a base level.  You know, educationally, you could - you
know, you recognize the need to improve there, and that's the first step.  You -
can do more in that area.  There are opportunities available.  Continue to - to look
at those.  Self-help, I think that's an area that you could have done a lot more.  I
think you've gained a lot of insight into yourself.  You've done it all - a lot of it
on your own.  Maybe some of these classes have - have helped you think about
things, but, you know, you have been down for a long time, you have thought a lot
about what got you here.  You might have been able to get there faster had you
more actively participated in some of these groups.  You know, we talked a lot at
your hearing about, okay, where does your strength come from.  A lot of your
strength comes from yourself.  Well, it sometimes helps to have some friends
around you  to help you along the way.  People are still - you're going to move
back to your same neighborhood, people are still committing murders out there,
and who are you going to rely upon when maybe the job doesn't come through, or
things don't happened that you - the way you want to?  Who are you going to fall
back on, okay?  Some people do it through things like NA/AA, some people do it
by church, some people have lots of family members around they can rely upon.
There's a lot of different resources.  You - you would get there faster and you
would - you would get some support if you - if you look for other people to help
you out along the way, if you understand what I'm saying.  We've also considered
- we've considered the psychological reports, and they always characterize their
prognosis for you in terms of,  "The inmate looks good, providing he, you know,
doesn't get in trouble with drugs or - or, you know, he makes good decisions, or
has a stable job and family," meaning you're going to be - do - do‑‑fine if the
gains that you've made here translate on the outside.  Well, sure, you know,
(indiscernible) live forever.  You need to develop those resources on the outside.
You know, in your parole plans you talked about the fact that you have marketable
skills.  What you've not been able to do is translate those more to tangible places
that you're going to work.  You still have a place to live with your family, but in
terms of work and support, that's kind of the big thing that needs to be filled in in

5

[*sic*] your presentation, okay.  There are resources here that will not only give you the skills but also help you to send that resume out to people.  Maybe you'll get - you'll get lots of "fine, you look good, talk to us when you get out."  You - you know, it's doubtful that you're going to get firm commitments, but at least you demonstrate that you know where to look and you know where to send that resume, but by just sending to somebody, you can then later go, "You remember me?  I sent you a resume four or five times," and somebody'll [*sic*] go, "Oh, yeah, you're the guy who's in prison, right?  You do look pretty good.  Do you got [*sic*] any other letters of recommendation"  You start to lay the foundation, okay, so that somebody is going to hire you.  You don't have to start cold.  Right now you pretty much have to start cold.  If you're looking at the union, Longshoreman's Union, you think like you really wanted to go there, but if that is a possibility, get a letter from them.  Make some connections on the outside.  Start thinking of yourself as somebody who can and at some point will get out, and then take that mindset and put it to work, utilizing skills on the outside, okay.  You don't have to be religious, but if you are religious, find a church and find a sponsor on the outside.  If AA is something that you're going to work with, or some other support group, you know, find a sponsor out there.  Halfway house a great vehicle to help you transition to the outside.  There's [*sic*] good ones in your area.  Talk to some of the chaplains here, or talk to somebody here, identify who they are.  You recognize the need that because you've been down for a long time that that transition is not going to be easy, but make some connections with people who can make it easier for you.  Like I say, start viewing yourself as somebody who can and will get out of here if you apply yourself,  you know?  Don't think of yourself as a - a life inmate here, think of yourself as an outside person, but then demonstrate not just for the Board - because we're not going to have to work out there, you - we already have jobs, you're the one that's going to have to do it - some concrete plans as to what you're going to do as an outside person on the outside person, okay.  We considered the input from the District Attorney's Office.  Our denial is for one year.  We frankly talked about that too, because we're certainly not - have not the ability to guarantee that you will get out in a year, about maybe a year and a half, because there's some things we want to see you work on right here.  I don't know what next time the Board is going to do, but the bottom line is, you did favorably impress as somebody not just who's been down for a long time, you have been down for a long time, you know, you're a life inmate and so, you know, there's no guarantee of getting out, but you have been down for a long time and done some positive things, wow [*sic*] got to dot the I's and cross the T's, make that transition into a  person that's suitable on the outside.  Let me turn it over to my colleague for any additional comments that he has.

  **DEPUTY COMMISSIONER SMITH:**  A couple of 12 the - the concerns that I had was, you know, you've had a number of parole hearings, you know, this is your eleventh, and as we discussed, you know, you've been - and you confirmed you've been told about the necessity of having firm parole plans.

The fact that you haven't put firm parole plans together, you know, makes me wonder a little bit how much you're - you're paying attention to the recommendations that have been made to you by prior Boards. The -

      **INMATE SHARP**:  Well, one thing -

      **DEPUTY COMMISSIONER SMITH:**  No, no.  No, no. This is - this my turn alone, okay?

      **INMATE SHARP**:  Okay.

      **DEPUTY COMMISSIONER SMITH:**  The other concern that I have, and - and it was brought up by the Deputy District Attorney, and - and it even moves forward to the most current Board Report, and under, you know, the version, your version of the commitment offense, and I'll quote it, it says:  "Sharp maintains that he feared for his life, and in his own mind he had no alternative but to take the individual's life or he himself would fall victim to the same circumstances," end of quote.  That tells me you still haven't come to terms with the commitment offense, you're still putting it off on the victim, and that's not acceptable, and - and in my opinion, as long as you maintain that version, you're going to be living with that version for many, many years, going through a whole list, or a whole number of subsequent parole hearings.  I wish you well.  Counsels, thank you.

**PRESIDING COMMISSIONER FARMER:**  Good luck to you, Mr. Sharp.

**INMATE SHARP:**  Thanks.[4]

Sharp contends that the Board:  (1) incorrectly found that his commitment offense was "egregious"; (2) impermissibly relied upon the commitment offense and his prior criminal history; and (3) the other factors cited by the board, e.g., reluctance to talk about the crime, receiving a counseling chrono, and lack of concrete parole plans, were insufficient.[5]  In rejecting Sharp's position, the Alameda County Superior Court held:

---

[4] Docket No. 14-2, pp. 111-21.

[5] In his Traverse, Sharp also contests the Board's determination that he lacks insight into his crime.  Sharp attaches two exhibits: (1) a "Comprehensive Risk Assessment" dated January 7, 2010; and (2) a letter from Re-Entry, Inc. dated August 10, 2010.  First, this Court does not normally address arguments raised for the first time in the traverse.  Second, it does not appear that Sharp raised his arguments on this point in his state court petitions.  Third, this court must decide the case on the basis of the evidence that was presented to the state courts; certainly not evidence that did not even exist until more than two years after the petition was filed in this Court.

The Petition for writ of habeas corpus is denied.  The Petition fails to state a prima facie case for relief.  Even though [Sharp] has submitted numerous documents in support of his Petition, review of the transcripts provided and documents pertaining to the August 23, 2006 hearing, indicate that there was no abuse of discretion by the Board of Prison Terms.  The factual basis of the BPT's decision granting or denying parole is subject to a limited judicial review.  A Court may inquire only whether some evidence in the record before the BPT supports the decision to deny parole.  The nature of the offense alone can be sufficient to deny parole. (In Re Rosenkrantz (2002) 29 Cal 4th 616, 652, 658, 682; In Re Dannenberg (2005) 34 Cal 4th 1061.)  The record presented to this Court for review demonstrates that there was certainly some evidence, including, but not limited to the committing offense, the Board's view that [Sharp] still lacks insight into the commitment crime and the motivation for his actions, [Sharp's] prior criminal history and his failure to profit from previous attempts at rehabilitation, [Sharp's] failure to remain totally disciplinary free, [Sharp's] need to demonstrate improvement educationally, [Sharp's] need for more involvement in self help programs and [Sharp's] lack of sufficiently viable and solid parole plans.  There is nothing in the record that indicates that the Board's decision was arbitrary or capricious, nor that [Sharp's] equal protection or due process rights were violated.  Thus, [Sharp] has failed to meet his burden of sufficiently proving or supporting the allegations that serve as the basis for habeas relief.[6]

While this case was pending, but before briefing in this case was completed, the United States Court of Appeals for the Ninth Circuit, sitting en banc, decided *Hayward v. Marshall*.[7] This Court must decide the case on the law as it exists at the time it renders its decision, and if the law changes while the case is pending, this Court applies the new rule.[8]  Thus, although it establishes a new rule, the holding in *Hayward* is controlling.

In this case, this Court "need only decide whether the California judicial decision approving the [Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or 'was based on an unreasonable determination of the

---

[6] Docket No. 14-5, p. 3.

[7] 603 F.3d 546 (9th Cir. 2010) (en banc).

[8] *See Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 281-82 (1969); *Lambert v. Blodgett*, 393 F.3d 943, 973 n.21 (9th Cir. 2004).

facts in light of the evidence.'"[9]  By its reference to § 2254(d), the Ninth Circuit implicitly, if not

explicitly, directed this Court to apply § 2254(d) to the decisions of the California Supreme

Court, using the same standards as are applied to the determination of the law as established by

the United States Supreme Court.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding."[10]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[11]  When a claim falls under the "unreasonable

application" prong, a state court's application of Supreme Court precedent must be objectively

unreasonable, not just incorrect or erroneous.[12]  The Supreme Court has made clear that the

objectively unreasonable standard is a substantially higher threshold than simply believing that

the state court determination was incorrect.[13]  Consequently, it appears that under the mandate of

---

[9] *Hayward*, 603 F.3d at 563 (footnotes citing 28 U.S.C. § 2254(d) omitted).

[10] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[11] *Williams*, 529 U.S. at 412.

[12] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[13] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

*Hayward*, this Court must canvas and apply California law as it existed at the time of the state court decision to the facts in the record as presented to the state court.

The mandate in *Hayward* is that this Court must review the decisions of state courts applying state law—in effect serving as a super-appellate court over state-court decisions. This requirement is in tension with the holdings of the Supreme Court. It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.[14] "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[15] This principle applied to federal habeas review of state convictions long before AEDPA.[16] A federal court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law.[17]

Respondent argues that California prisoners have no liberty interest in parole, and that if they do, the only due process protections available are a right to be heard and a right to be

---

[14] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[15] *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[16] *See Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

[17] *See Bradshaw*, 546 U.S. at 76-78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous.").

informed of the basis for the denial.[18]  That is, Respondent contends that there is no due process

right to have the result supported by sufficient evidence.  Because it is contrary to binding Ninth

Circuit law,[19] Respondent's argument is without merit.

At the time that the Board and the California courts rendered their decisions, the

California "some evidence" rule was embodied in *In re Rosenkrantz*[20] and *In re Dannenberg*.[21]

Subsequently, the California Supreme Court, applying *Rosenkrantz* and *Dannenberg*, decided *In*

*re Lawrence*[22] and *In re Shaputis*.[23]

In *Rosenkrantz*, the California Supreme Court held:

[. . . .]  Due process of law requires that [the Board's] decision be
supported by some evidence in the record.  Only a modicum of evidence is
required.  Resolution of any conflicts in the evidence and the weight to be given
the evidence are matters within the authority of the [Board].  [. . . .]  [T]he precise
manner in which the specified factors relevant to parole suitability are considered
and balanced lies within the discretion of the [Board] . . . .  It is irrelevant that a
court might determine that evidence in the record tending to establish suitability
for parole far outweighs evidence demonstrating unsuitability for parole.  As long
as the [Board's] decision reflects due consideration of the specified factors as
applied to the individual prisoner in accordance with applicable legal standards,
the court's review is limited to ascertaining whether there is some evidence in the
record that supports the [Board's] decision.[24]

---

[18] *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1,
15 (1979).

[19] *See Pirtle v. California Bd. of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010);
*Cooke*, 606 F.3d at 1213-14 (citing *Hayward*, 603 F.3d at 561-64); *Pearson*, 606 F.3d at 610-11
(same).

[20] 59 P.3d 174 (Cal. 2002).

[21] 104 P.3d 783 (Cal. 2005).

[22] 190 P.3d 535 (Cal. 2008).

[23] 190 P.3d 573 (Cal. 2008).

[24] *Rosenkrantz*, 59 P.3d at 218.  Quoted with approval in *Shaputis*, 190 P.3d at 585.

The California Supreme Court then held:

> The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. (Citations omitted.)  Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant.  [. . . .]
>
> In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.  Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ."  (Pen.Code, § 3041, subd. (a).)  "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.)  [¶]  Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date." ( Citation omitted.)[25]

In *Dannenberg* the California Supreme Court explained:

> [. . . .]  So long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board [citing *Rosenkrantz*], the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders. Section 3041 does not require the Board to schedule such an inmate's release when it reasonably believes the gravity of the commitment offense indicates a continuing

---

[25] *Id.* at 222; *see Shaputis*, 190 P.3d at 584-85 ("The record supports the Governor's determination that the crime was especially aggravated *and*, importantly, that the aggravated nature of the offense indicates that the petitioner poses a current risk to public safety." (emphasis in the original)).

danger to the public, simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes.[26]

The California Supreme Court then held:

> Thus, there clearly was "some evidence" (citing *Rosenkrantz*) to support the Board's determination that Dannenberg's crime was "especially callous and cruel," showed "an exceptionally callous disregard for human suffering," and was disproportionate to the "trivial" provocation.  Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date.[27]

The Board must, however, "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.[28]  The Board "may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences."[29]  In *Lawrence*, however, the California Supreme Court rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current dangerousness," holding:

> [W]e conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.[30]

---

[26] *Dannenberg*, 104 P.3d at 795.

[27] *Id.* at 803.

[28] *Id.* at 786-87, 802-803; *see Rosenkrantz*, 59 P.3d at 222.

[29] *Dannenberg*, 104 P.3d at 803 n.16 (citing *Rosenkrantz*, 59 P.3d at 219).

[30] *Lawrence*, 190 P.3d at 554-55; *see Cooke*, 606 F.3d at 1214.

13

This Court must, therefore, determine whether the decisions of the California courts upholding the Board's denial of parole complied with California law as expressed in *Lawrence* and *Shaputis*.  Because state court judgments carry a presumption of finality and legality, Sharp has the burden of showing by a preponderance of the evidence that he merits habeas relief.[31] Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[32]  This presumption applies to state trial courts and appellate courts alike.[33]  Both the subsidiary findings on the applicable factors and the ultimate finding of some evidence constitute factual findings.[34]

With respect to the underlying commitment offense, the applicable regulation provides:

(1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
    (C) The victim was abused, defiled or mutilated during or after the offense.
    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.[35]

---

[31] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[32] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[33] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[34] *Cooke*, 606 F.3d at 1216.

[35] Cal. Code Regs., tit. 15, § 2281(c).

The evidence clearly supports a finding that this case falls with the scope of (1)(B) and (1)(E).  Under California law, a court neither re-weighs the evidence nor substitutes it's discretion for that of the Board.  Judicial review of a decision denying parole is "extremely deferential."[36]  Thus, under *Rosenkrantz* and *Dannenberg*, this Court could not say that the decision of the Alameda County Superior Court was contrary to, or involved an unreasonable application of California law at the time it was decided, or was based on an unreasonable determination of the facts in light of the evidence.  On the other hand, because *Hayward*, *Pearson*, *Cooke*, and *Pirtle* require that *Lawrence* and *Shaputis* be applied, this Court must look to determine whether there was some factor in addition to the underlying commitment offense to support denial of parole.

In addition to the underlying commitment offense, the Board relied upon Sharp's prior criminal history,[37] the lack of adequate parole plans,[38] and that Sharp had not yet come to terms with the causes associated with the underlying commitment offense thereby lacking insight into it.  Sharp's lack of insight is a sufficient additional factor to support a determination that Sharp

---

[36] *Rosenkrantz*, 59 P.3d at 210.

[37] Sharp committed the underlying commitment offense at the age of 16, his prior criminal history is all juvenile, starting at age 9.  As recited by the Board, Sharp's juvenile history included, multiple burglaries, battery, several robberies, carrying a concealed weapon, auto theft, and brandishing a revolver.  Docket No. 14-1, pp. 58-59.  That this is an adequate additional basis to support a finding of current dangerousness is questionable. Cal. Code Regs., tit. 15, § 2281(c)(2) (previous history of inflicting or attempting to inflict serious injury on a victim); *See In re Cerny*, 101 Cal. Rptr.3d 200, 207-08 (Cal. App. 2009) (applying the identical provision in Cal. Code Regs., tit 15, § 2402(c)).

[38] This Court agrees with Sharp that the Board's reliance on this was too tenuous to support a determination of current dangerousness.

posed an unreasonable risk danger to society or a threat to public safety.[39]  Applying *Lawrence*

and *Shaputis*, this Court cannot say that the decision of the Alameda County Superior Court was

contrary to, or involved an unreasonable application of California law at the time it was decided,

or was based on an unreasonable determination of the facts in light of the evidence.  Sharp is not

entitled to relief.

IV.  ORDER

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[40]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[41]

The Clerk of the Court is to enter final judgment accordingly.

Dated:  January 10, 2011.

/s/ James K. Singleton, Jr.

JAMES K. SINGLETON, JR.
United States District Judge

---

[39] *Shaputis*, 190 P.3d at 575, 581, 585.

[40] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," *i.e.,* when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).

[41] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.